Luke Andrew Busby, Ltd.
Nevada State Bar No. 10319
216 East Liberty St.
Reno, NV 89501
775-453-0112
luke@lukeandrewbusbyltd.com
*Attorney for the Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| ADAM WYNN TINGLEY,<br><br>                    Plaintiff(s),<br>        vs.<br><br>DR. R. BRUCE BANNISTER, et al.<br><br>                    Defendant(s).<br>_____/ | Case No. 3:14-cv-000358 MMD-VPC<br><br>**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** |

1.      COMES NOW, Plaintiff, ADAM WYNN TINGLEY, by and through the undersigned counsel, and hereby files the following Response in Opposition to the January 29, 2016 Defendant's Motion for Summary Judgment (Doc. 66) (hereinafter "Defendant's Motion").

2.      This Opposition is made and based upon all of the pleadings and records on file for this proceedings together with every exhibit that is mentioned herein or attached

hereto (each of which is incorporated by this reference as though it were set forth hereat in haec verba), if any there be, as well as the points and authorities set forth directly hereinafter.

## MEMORANDUM OF POINTS AND AUTHORITIES

I. STANDARD OF REVIEW

3.      Pursuant to Federal Rule of Civil Procedure ("FRCP") 56, an order granting summary judgment should be issued only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Summary judgment should be granted only if, taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party, there are no genuine issues of material fact. *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013).  An issue of material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010).

4.      The Defendants, while acting under color of Nevada law, deprived the Plaintiff of his Eighth Amendment right to be free from cruel and unusual punishment, as secured by the Constitution. *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986).

5.      The Plaintiff's suffering was caused by the Defendants delay of and denial of medical care.  This delay and denial was serious enough to constitute cruel and unusual punishment in violation of the Plaintiff's Eighth Amendment rights.  *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). Prison officials are deliberately indifferent to a prisoner's serious

medical needs when they "deny, delay, or intentionally interfere with medical treatment." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1984). A prisoner's Eighth Amendment rights are violated when two requirements are met: (1) The deprivation alleged must be objectively, "sufficiently serious," where the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm; and (2) The official must be subjectively aware of that risk and act with deliberate indifference to inmate health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 and 839-840 (U.S. 1994).

6. The Defendants, by their actions and/or inactions described below, were deliberately indifferent to the Plaintiff's serious medical needs. The "deliberate indifference" rule applies to physical, dental, and mental health. *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982). The deliberate indifference towards the Plaintiff's serious medical needs was manifested by the Defendants in their written and oral responses to the Plaintiff's complaints about his serious medical needs, by the Defendant corrections officers and staff denying or delaying access to medical care by ignoring the Plaintiff's repeated requests for surgery, and then for postoperative medication, by the fact that the Defendants knew that the Plaintiff had not received the necessary postoperative medication as directed by his doctor, and refused to provide such medications in a timely manner despite the pleas of the Plaintiff and from his doctor. *Estelle v. Gamble*, 429 U.S. 97, 104-105 (U.S. 1976).

II. FACTS

7. The Plaintiff was incarcerated or on parole at various Nevada Department of

Corrections ("NDOC") prisons in Nevada from 2004, until he was last released in June of 2015. The Plaintiff was finally discharged without parole from NDOC on June 19th 2015. (See Exhibit 14)

8.      The Defendants have admitted that they are or were employees of the (Exhibit 1 page 2 lines 7-8) as follows: Defendant Dr. R. Bruce Bannister was employed by NDOC as Medical Director; Defendant Sue Hoffman is and was at all relevant times employed by the Nevada Department of Corrections at Warm Springs Correctional Center ("WSCC") as a Correctional Nurse; Defendant Kari McCullah is and was at all relevant times employed by the Nevada Department of Corrections at WSCC as a Correctional Nurse; and Defendant John Perry is and was at all relevant times employed by NDOC at WSCC as Director of Nursing Services.

9.      While the Plaintiff was held in the custody of NDOC, the Plaintiff suffered from a condition of the eye called "pterygium." Pterygium is a painful condition of the eye where the scleral conjunctiva invades the cornea, leading to obscured vision, redness, inflammation, and a feeling that a foreign object had invaded the eye. Failure to property treat pterygium can lead to permanent eye disfigurement, pain, and vision problems, including corneal scarring and blindness in varying degrees. (See Exhibit 2)

10.     The Plaintiff has properly disclosed his treating Ophthalmologist (See Exhibit 3) Dr. Thomas Komadina as a non-retained expert witness. At the November 4, 2015 deposition of Dr. Komadina, described the Plaintiff's pterygium as follows:

Well, typically, they have a light sensitivity. Sometimes as in this case, they'll have diminished vision, which he had a fairly significant vision loss.· They oftentimes will have chronic irritation on their eye and redness associated with the pterygium.

Q:· Could the symptoms of a pterygium be debilitating?

A:· Yes.

Q:· Okay.· Do you believe in Mr. Tingley's case when you saw him at this time that his symptoms were debilitating?

A:· Not only debilitating, but sight-threatening. (Exhibit 4 at page 9 line 18).

11.    In 2004, the Plaintiff saw an NDOC doctor, who told Plaintiff that he had pterygium in his left eye and needed eye surgery.  The Plaintiff sought treatment for his eye at this time because his eye was dry and he felt a constant feeling of having a foreign object in his eye.   (Exhibit 14) As indicated at Tingley Initial Discl. Bates No. 18 in Exhibit 5, which are excerpts from the "Physician's Orders" in Plaintiff's medical chart, there is a note dated February 17, 2004 indicating, "Eye clinic - pterygium obstructing…."

12.    From early 2004 to 2006, the Plaintiff repeatedly requested surgery to treat his pterygium, but NDOC officials, including Dr. Bannister, repeatedly denied the Plaintiff's surgery requests.[1]  From February 2004 through June 2006, Plaintiff's pain increased and

---

[1] Below are summaries of the requests made by the Plaintiff in Kites in Exhibit 9 between August 30, 2004 and October 18, 2006, seeking medical treatment or medication for his eye condition: 08/30/04 I need to see the Ophthalmologist Tingley Initial Discl. Bates No. 110;  09/24/04 I need refill on eye drops. I'm having increasing pain. Tingley Initial Discl. Bates No. 109; 01/12/05 I watched the eye Dr. write a prescription for Acular at my visit 4 weeks ago. He also said he would RUSH it. What Happened???? Tingley Initial Discl. Bates No. 108; 02/20/05 I was told by medical staff that my prescription would be here soon. That was a month ago. Tingley Initial Discl. Bates No. 107; 03/26/05 Still waiting for Acular Tingley Initial Discl. Bates No. 106; 04/04/05; 12/24/05 Please re-fill eye drops Tingley Initial Discl. Bates No. 198;  02/22/06 I need to see the eye Dr. please. Tingley Initial Discl. Bates No. 191;  04/12/06 Have I been approved for eye surgery? Tingley Initial Discl. Bates No. 277; 4/12/06 UR Panel denied surgery again. Tingley Initial Discl. Bates No.  277;  05/23/06 I need Pred Forte and Wet Tears. Tingley Initial Discl. Bates No. 189;  06/28/06 Still waiting for Pred Forte. Tingley Initial Discl. Bates No. 186; 09/03/06 Dr. Fisher told me about his 2 recommendations that may allow me to regain some of my vision again. What is the next step? Tingley Initial Discl. Bates No. 184; 09/11/06 I need appointment with Dr. Fisher. Tissue is growing back and I'm in pain. Tingley Initial Discl. Bates No. 185; 09/28/06 I would like to be seen by Dr. Fisher. I have some questions that Dr. Snyder could not answer. Tingley Initial Discl. Bates No.  183;  10/18/06 My eye is causing me a lot of pain! Please schedule me with Dr. Gedney or Dr. Fisher. Tingley Initial Discl. Bates No. 182; and 10/18/06 Please re-fill eye drops. Tingley Initial Discl. Bates No. 182.

ultimately he lost all sight in his left eye. (See Exhibit 14) Despite having personal knowledge of the Plaintiff's eye problems, Dr. Bannister continued to deny the Plaintiff's surgery requests from the Plaintiff,   Dr. Karen Gedney, and other medical personnel. Attached hereto as Exhibit 6 are the Utilization Review Panel ("UR Panel") documents disclosed by NDOC.  The Plaintiff made the following requests to the UR Panel before his eye surgery in in July of 2006:

  a. On September 10, 2004 Dr. Scott referred the Plaintiff for surgery, stating that the Plaintiff  had a "large pterygium left eye causing blind" (Exhibit 6 NDOC No. 0262).  This request was disapproved by the UR Panel on September 14, 2004.

  b. On December 21, 2004, Dr. Gedney referred the Plaintiff for eye surgery stating that the condition significantly affected the Plaintiff's quality of life. (Exhibit 6 NDOC No. 0275).  The UR Panel did not respond to this request in the document in the Plaintiff's possession

  c. On April 5, 2006, Dr. Gedney again referred the Plaintiff for surgery stating that the condition significantly affected the Plaintiff's quality of life and that if surgery were delayed the Plaintiff could require a corneal transplant.  Dr. Gedney also notes, "Blindness lt eye." The UR panel approved the request, but directed the surgery to occur after July 1, 2006. (Exhibit 6 NDOC No. 0268).  On the same document, the Plaintiff's discharge date is noted as June 3, 2006, before his surgery was to be scheduled.

  13. In June 2006, Dr. Fisher, an outside ophthalmologist, saw Plaintiff and stated that Plaintiff's eye was in the worst condition that Dr. Fisher had ever seen. (See Tingley Initial Discl. Bates No. 46 in Exhibit 8, which are the records from the Plaintiff's first surgery).  Dr. Fisher later commented that the Plaintiff "continues to ow scar tissue in the visual axis which is due, to the extensive   pterygium and the length of time that it was there." (See Tingley Initial Discl. Bates No. 44 in Exhibit 8).

14.    On July 12, 2006, Dr. Fisher operated on Plaintiff and prescribed eye drops that were essential to the Plaintiff's recovery.  *Id.*  Two weeks after this surgery, the Plaintiff saw Dr. Fisher again and Dr. Fisher stated that the Plaintiff "should remain on his Tobradex four times a day for four more weeks and see me in a month." (See Tingley Initial Discl. Bates No. 45 in Exhibit 8)

15.    After the July 12, 2006 surgery, NDOC refused to give and/or delayed providing the Plaintiff with necessary postoperative eye drops and Plaintiff's first surgery failed.  (See Exhibit 14) As shown in Exhibit 10 at Tingley Initial Discl. Bates No. 000386, the first record of NDOC ordering  postoperative eye drops for the Plaintiff was not until July 25, 2006, and he did not receive his drops until August 2, 2006.  For reasons explained in greater depth below, i.e. the deposition of Dr. Komadina, it is reasonable to conclude that this denial of postoperative drops after this first surgery did at least contribute to the failure of this surgery and the subsequent return of the Plaintiffs eye condition.

16.    On November 27, 2007, Dr. Fischer noted the return of the Plaintiff's pterygium, "As you know he underwent pterygium excision with a graft in July of 2006. He returned to see me on 11/27/2007.  There appears to be regrowth of the vessels into the scar tissue." (See Tingley Initial Discl. Bates No. 43 in Exhibit 8 and Exhibit 14)

17.    After the Plaintiff's symptoms noticeably resurfaced the Plaintiff started to experience pain and again made multiple requests to NDOC, of which Dr. Bannister was

aware, for another surgery by filing numerous kites[2] and by requesting that the UR Panel

---

[2]  Below are summaries of the requests made by the Plaintiff in Kites in Exhibit 9 between July 30, 2008 and December 15, 2014, seeking medical treatment or medication for his eye condition: 06/30/08 I'm running out of eye drops. Eye Dr. increased my dosage to 4 times a day, not just one bottle per month. Tingley Initial Discl. Bates No. 176; 07/08/08. The eye Dr. recommended I go back to Dr. Komadina again. Will they send me? Tingley Initial Discl. Bates No. 175; 07/29/08 Am I still scheduled to see Dr. Komadina?  Tingley Initial Discl. Bates No.  173; 08/30/08 Please re-fill eye drops. Tingley Initial Discl. Bates No. 172; 09/10/08  I am having problems with my left eye still. I am having a lot of pain. Tingley Initial Discl. Bates No. 171;  09/22/08 Please re-fill eye drops. Tingley Initial Discl. Bates No. 170; 11/18/08  I am once again running out of my eye drops and still waiting for re-fill. Please re-fill. Tingley Initial Discl. Bates No.  167; 03/04/09 I have more questions for the eye Dr. Tingley Initial Discl. Bates No.  163; 04/13/09  Have my eye drops (Pred Forte) come in yet? They were ordered 4 weeks ago. Tingley Initial Discl. Bates  No.  160; 05/02/09 What happened to my Pred Forte? These were ordered almost 2 months ago! Tingley Initial Discl. Bates No.  156; 05/11/09 I've had an "As Needed" prescription for eye drops written by Dr. Gedney, so what has happened? Tingley Initial Discl. Bates No.  159; 06/26/09 I was moved to another unit and the officers came and took my eye drops... A week ago, how do I get more? Tingley Initial Discl. Bates No. 155; 09/20/09 I'm out of eye drops, please re-fill. Tingley Initial Discl. Bates No.  150; 10/25/09 I'm running low on eye drops, please re-fill. Tingley Initial Discl. Bates No. 148; 11/09/09 The eye that was operated on is getting bad again. I need to see eye Dr. please. I am experiencing pain. Tingley Initial Discl. Bates No.  147; 11/15/09  Please schedule me with eye Dr. I am having problems with my eye and cannot wait 2 months for appointment. Tingley Initial Discl. Bates No. 129; 11/16/09 Please re-fill eye drops my eye has been giving me a lot of problems lately. Tingley Initial Discl. Bates No. 146; 12/04/09 Was my eye apt. changed? Tingley Initial Discl. Bates No. 290; 12/06/09 I need re-fill on eye drops. Tingley Initial Discl. Bates No. 285; 12/07/09 I am having severe pain in my eye almost unbearable. Dr. Bannister ordered me as needed IBU's. Why can I not get these? Tingley Initial Discl. Bates No. 128; 12/29/09 I just want to confirm I've been scheduled for eye Dr. visit. I was originally scheduled for eye Dr. on 11/9/9 Tingley Initial Discl. Bates No. 284;  01/13/10 I need re-fill on eye drops Tingley Initial Discl. Bates No. 139; 01/25/10 Well it's been more than 2 months since I was told I was scheduled to be seen by eye Dr. Am I still scheduled? Tingley Initial Discl. Bates No. 132; 01/29/10 I was just seen by yet another eye Dr. Surgery was denied on my left eye until I was blind. Tingley Initial Discl. Bates No. 1214;  02/22/10 The Dr. I seen back in Jan. told me I was going to be sent back to NNCC because of eye problems. What happened? Tingley Initial Discl. Bates No. 127; 03/24/10 I need to see Dr. Gedney about pain in my eye. Tingley Initial Discl. Bates No. 126; 06/07/10 When am I going to be seen by Dr. Gedney? eye drops and prescriptions have long since expired and I'm in pain and it's getting worse. Tingley Initial Discl. Bates No. 118; 08/18/11 I need eye drops re-filled. Tingley Initial Discl. Bates No.  130; 08/30/11 Last week the nurse brought my eye drops and said she would bring my pain meds the next day.. that was a week ago. What happened to her? Tingley Initial Discl. Bates No. 274; 01/11/12 Please re-fill eye drops. Tingley Initial Discl. Bates No.  272; 02/28/12 Please re-fill eye drops. Tingley Initial Discl. Bates No. 271; 06/04/12 Please re-fill eye drops. Tingley Initial Discl. Bates No. 270;  07/12/12 Please re-fill eye drops. Tingley Initial Discl. Bates No. 269; 08/24/12 Please schedule me with eye Dr. my rt. Eye is giving me problems. Tingley Initial Discl. Bates No. 267; 09/10/12 Please re-fill eye drops. Tingley Initial Discl. Bates No. 266; 10/03/12 Please re-fill eye drops. Tingley Initial Discl. Bates No.  265; 12/04/12 Please re-fill eye drops. Tingley Initial Discl. Bates No. 263; 01/25/13 I need to see the eye Dr. please Tingley Initial Discl. Bates No. 262  01/26/13 I need to see eye Dr. My rt. Eye is now experiencing slight pain like left eye did. I do not want to go completely blind while I'm in prison Tingley Initial Discl. Bates No.  261; 03/13/13 I am still waiting for eye drops. Tingley Initial Discl. Bates No.  253; 04/04/13 Please re-fill eye drops. Tingley Initial Discl. Bates No.  249; 04/15/13 Will the UR Panel and Dr. Bannister finally approve corneal transplant by Dr. Komadina. Tingley Initial Discl. Bates No.  248; 4/15/13 kite to medical to cancel apt with Dr. Fisher, that it would do no good, he would just refer to Komadina again. Tingley Initial Discl. Bates No. 247; 04/16/13 Instead of surgery on my right eye would UR Panel finally agree to fixing my left eye destroyed by DOC waiting too long. Tingley Initial Discl. Bates No. 247;  04/19/13 Letter to Dr. Bannister. Tingley Initial Discl. Bates No. 276/246;  04/25/13 Please re-fill eye drops. Tingley Initial Discl. Bates No.  244;  05/11/13 Please re-fill eye drops. Tingley Initial Discl. Bates No.  243; 05/30/13 Please re-fill eye drops. Tingley Initial Discl. Bates No. 242; 06/10/13 Have I finally been re-scheduled to go back to Dr. Komadina?Tingley Initial Discl. Bates No. 241; 06/13/13 Eye Dr. ordered eye drops for pain over 2 weeks ago. Has this been filled yet? Tingley Initial Discl. Bates No. 240; 06/13/13 Please re-fill eye drops. Tingley Initial Discl. Bates No.  239; 06/20/13 Have I been approved for eye surgery? Tingley Initial Discl. Bates No.  238; 06/24/13 I have been waiting for 3 weeks now for approval from Dr. Bannister for my latest prescription eye drops for pain. How long until I receive them? Tingley Initial Discl. Bates No.     237; 07/01/13 Please re-fill eye drops Tingley Initial Discl. Bates No. 236. 07/05/13 Still waiting for Ketorolac. Tingley Initial Discl. Bates No. 235; 07/08/13 Please re-fill eye drops. Tingley Initial Discl. Bates No.  234;  07/11/13 Have I been approved to go back to Dr. komadina yet? Tingley Initial

approve as much.

18.     The record shows that the UR Panel, again, denied and/or delayed getting the

Plaintiff the treatment he needed for his eye for years:

    a.  On June 26, 2008, Dr. Gedney requested UR panel approval for the Plaintiff to see Dr. Komadina because the "pterygium which was removed 1 yr ago. now scarring. optometrist recommends Dr. Komadina."  The UR Panel disapproved this request on July 15, 2008 without explanation (Exhibit 6 NDOC No. 0232).

    b.  On January 29, 2010, Dr. Aranas requested UR Panel approval for the Plaintiff to see an opthamologist.  The UR Panel responded on March 2, 2010 by directing that the Plaintiff be transferred to NNCC to be seen by Dr. Fischer. (Exhibit 6 NDOC No. 0229)

    c.  On March 4, 2013, "V. VanHornal" requested that the Plaintiff be referred to Dr. Fischer due to his pterygium.  The UR Panel responded on March 12, 2013 by approving the request. (Exhibit 6 NDOC No. 0065)

    d.  On June 19, 2013, Dr. Gedney then requested that the Plaintiff be referred to Dr. Komadina for his failed pterygium surgery.  The UR Panel responded on June 25, 2013 by deferring the request back to Dr. Gedney.  On September 23, 2013, Dr. Gedney responded by stating, "I am not an eye specialist UR needs to send pt to Dr. Komadina or deny it." (Exhibit 6 NDOC No. 0053)

19.     Dr. Bannister, as a member of the UR Panel,  again delayed and/or denied the

Plaintiff's requests for a second surgery for years.   The Plaintiff was told on multiple

occasions that it was Dr. Bannister who was denying his requests for surgery. (See Exhibit

Discl. Bates No. 233; 07/16/13 I was told by Dr. Fisher, Dr. Komadina and Dr. Seljistat that I must always wear 100% UV protection sun glasses whenever I am outside. Tingley Initial Discl. Bates No. 231;  8/23/13  Refill drops. Tingley Initial Discl. Bates No.  229; 09/02/13 Please refill eye drops,, not even emailed by medical until 09/24/13 Tingley Initial Discl. Bates No. 222; 09/05/13 I'm completely out of Ketorolac Please , please re-fill. Tingley Initial Discl. Bates No. 225;  09/09/13 Please re-fill eye drops Tingley Initial Discl. Bates No. 223; 10/09/13 Please re-fill eye drops Tingley Initial Discl. Bates No.  220; 11/05/13 Please re-fill eye drops. Tingley Initial Discl. Bates No. 212; 11/20/13 Please re-fill eye drops Tingley Initial Discl. Bates No. 210; 01/26/14 Please re-fill IBUs. Tingley Initial Discl. Bates No. 203; 02/25/14 Please re-fill IBUs for eye pain. Tingley Initial Discl. Bates No. 202; 10/20/14 Please re-fill eye drops. Tingley Initial Discl. Bates No.  98;  and  12/15/14 Please schedule me with a Dr. I have some questions about my right eye. Tingley Initial Discl. Bates No.  83.

14)

20.     It is important to note that from 2008 until his surgery in 2014, the Plaintiff continually suffered from various symptoms, including headaches, obscured vision, and pain as a result of his untreated pterygium. (See allegations of fact in Second Amended Complaint in Doc. #56, which were supported by the Declaration of Adam Tingley on page 8 and Exhibit 14)).

21.     The Plaintiff did not have another eye surgery for his Pterygium until February 19th of 2014, which was performed by Dr. Komadina in Reno, Nevada. (Exhibit 4 page 12 line 5) Dr. Komadina described the surgery as follows:

Q:· Okay.· And, just to back up for a moment, can you describe just very basically how you did the surgery on the plaintiff's eye on February 19th?
A:· Sure.· He had a very large recurrence that extended, as you can see on the circular picture again on February 20th, that extended not only to the center of his cornea but also beyond the center of his cornea, so that's why his vision was so poor.· And so, I removed the pterygium off of the cornea and also then took it back onto the white part of the eye, or where the sclera is, the white part of the eye, and there's a tissue that covers it called conjunctiva and the ·1· pterygium extended on to that conjunctival area as well.· And so, I removed it off of that area.· It was a fairly -- you know, it was a large pterygium.· It took, you know, as I remember this, it was almost two hours to remove all of this scar tissue off of his eye.· We know historically that, if you only remove the pterygium from the cornea and on the white part of that eye and do nothing other than that, that the recurrence rate is extremely high particularly in a patient like Mr. Tingley, who's already had one, you know, prior surgery and had had this recurrence, that it probably is somewhere in the -- as the literature shows 50 to 60% recurrence rate, if you only do that part of the surgery.· So, in addition to that, I applied mitomycin C, which is a chemotherapeutic agent, to the white part of the eye and you leave it on for two minutes and that kills the cells called fibroblast, which makes scar tissue.· And you leave it on for two minutes, and then, you rinse it off the eye, and then, finally, the tissue graft is -- is positioned in the area where the defect is on the white part of the eye.· The combination of doing those additional steps, the mitomycin C and the tissue graft, cuts the recurrence rate from 50

to 60% down to, currently in my practice, to about 6%.· So, you know, it fairly dramatically cuts down recurrence rate on a pterygium.

Q:· Okay.· So, are you saying that, all of the things being equal, Mr. Tingley should have had -- the chance of a recurrence would have been 6% based on your experience in your practice?

A:· Yes.

(Exhibit 4 at page 16 line 15)


22.     After the second surgery, Dr. Komadina prescribed eye drops called "tobradex" essential to Plaintiff's successful recovery from the second surgery.   At his deposition, Dr. Komadina further described tobradex as follows:

Q:· Okay.· Did you prescribe any postoperative medications for Mr. Tingley after the February 19 surgery?

A:· I did.

Q:· Okay.· Do you recall what those medications were?

A:· It was an antibiotic steroid medication called Tobradex.· The purpose of that medication is to prevent postoperative infection and the steroidal component is to decrease postoperative inflammation.

Q:· Okay.· And just in layman's terms, what did those medications do after the surgery?

A:· Well, the tobramycin component, the concept of using that is to try and prevent infection.· There are sutures associated with the surgery that I did.· If you look at my little drawing there on February 20th, we'll see that I've put in a tissue graft and that tissue graft is sewn into place with small dissolvable sutures that disappear over several weeks and those sutures can become infected because they're on the surface of the tissue graft and they can attract bacteria and can infect the graft.· So, the point of the antibiotic component is to prevent the tissue graft from becoming infected, and then also, if you note in the circular area, which is the part of his cornea that I took the pterygium off, that can become infected as well.· And in addition to that, the donor sites, all these places can become infected postoperatively.· So, the idea behind using the antibiotic component is to try and decrease risk of postoperative infection in these three sites.· The dexamethasone component to the Tobradex is a topical steroidal medication. It's a combo drug, so it's all in one bottle.· And it's critical, in my estimation, for patients having had this surgery that we try and get their eye quieted down as quickly as possible with the steroidal medication so that they potentially don't form new scar tissue or recurrent pterygium. (Exhibit 4 page 15 line 8).

At his deposition, Dr. Komadina also emphasised that the medication he ordered for the Plaintiff post surgery was not difficult to obtain and are readily available at any pharmacy in Carson City. (Exhibit 4 page 24 line 7).

23.     After the February 19, 2014 surgery, Dr. Komadina provided the Plaintiff with small sample bottles of the prescribed tobradex medication, but these samples only lasted a few days after the surgery (See Exhibit 14).

24.     Dr. Komadina spoke with Sue Hoffman shortly after the February 19, 2014 surgery and informed her of the importance that the Plaintiff receive his postoperative eye drops:

Q:· Did you explain the need for postoperative medication to anyone from the Department of Corrections?
A:· I did.
Q:· Do you remember who?
A:· I don't remember the nurse's name, but I wrote the  prescription like -- you know.· And in the office typically, the guards take, you know, copies of our notes from any particular visit back to the medical dispensary.· They have a form I fill out as to what I think should be done and I indicated in those forms, which I do not have copies of.· And also, when it became apparent that he wasn't getting his medications, I talked to one of the nursing staff and discussed it, you know, the importance of getting the medication, which apparently had become a problem.
Q:· Can you explain what you mean by apparently it had become a problem?
A:· Well, the patient indicated to me that he was not getting his medication, his postoperative medication, and as we were just discussing, it's critical in these patients that they receive that to decrease their postoperative risk of not only infection but also of recurrence. (Exhibit 4 page 18 line 16)

25.     At the November 19, 2015 deposition of Corrections Officer Brandt Halling (Exhibit 11), Officer Halling testified that he was present and and heard the conversation between Dr. Komadina and Defendant Sue Hoffman that occurred shortly after the

surgery.  Halling testified as follows:

> ...The doctor, I believe, got on the phone with Ms. Hoffman and was very adamant that that specific eye drop was the one that needed to be there for him because it was the one that would take care and keep the surgery or the eyes from lapsing back.
>
> Q:· When did this conversation occur?
> A:· In the operating room.
> Q:· So, just after Mr. Tingley received the surgery?
> A:· Yes, sir.
> Q:· And how do you know that Dr. Komadina was speaking to Ms. Hoffman?
> A:· Because I am the one that called her. (Exhibit 11 page 16 line 10).

26.    Ms. Hoffman told the Plaintiff that it was not her job to personally provide the Plaintiff with eye drops. (See allegations of fact in Second Amended Complaint in Doc. #56, which were supported by the Declaration of Adam Tingley on page 8 Exhibit 14).

27.    On a February 25, 2014 follow up visit by the Plaintiff shortly after the second surgery to Dr. Komadina, Dr. Komadina became aware that the Plaintiff had not been provided with tobradex by NDOC.  Dr. Komadina then again called Ms. Hoffman to address the issue:

> Q:· Do you remember the contents of that conversation?
> A:· You know, that was the discussion about why, you know, it was now six days postoperative, he still had not received his medications, or had run out of them and there's issues about him getting more of the medication.· And it wasn't -- I don't know.· It was kind of a disturbing discussion to me because she indicated to me that I was supposed to provide all of his postoperative medication.· And I told her that, you know, I had no, you know, license to be a dispensing pharmacy.· And that I had some samples and which I gave him, but that, you know, we get very limited samples of pharmaceutical medications and she insisted that I provide the medication.· I just indicated to her that that was really not in my purview and that really the correctional center was to provide the postoperative medication.
> Q:· So, this person that you spoke to knew that Mr. Tingley needed the postoperative medication?
> A:· I tried to make that clear to her that he did.

Q:· And do you recall specifically what you told her?

A:· I don't recall, you know.· Other than knowing that, you know, I told her the importance of having the medications as we discussed earlier about preventing infection  and recurrence.· You know, I discussed that with her, but I didn't record any conversation, so I don't know exactly, you know, every single thing that was said other than the highlights that I just mentioned.

Q:· Did the person you spoke to, as indicated in your notes, express any particular interest or sympathy or concern about Mr. Tingley's condition?

A:· I don't think that we discussed that.· She was  fairly adamant that I was -- you know, the thing that struck me that I remember about the conversation, you know, now that we're a year and a half later is that she was fairly adamant that I provide the medication for him.· And I tried to explain to her that I don't, again, don't have a license to do such a thing.  And to me, it's frustrating when the state is willing to provide care for a patient and including the cost of doing the surgery, and the medications are, in the scheme of things, relatively small expenses.· And it didn't make sense to me that that they would go to the trouble and expense of providing surgical therapy to a patient, which costs thousands of dollars by the time you add in surgical fees and then anesthesia cost, the cost of having the surgery center and -- and yet, the thing that disturbed me was that they weren't willing to provide the medication for his postoperative care. (Exhibit 4 page 20 line 6)

28.     As shown in Exhibit 10 at Tingley Initial Discl. Bates No. 000391,  the first record of NDOC ordering  postoperative tobradex eye drops for the Plaintiff after his February 19, 2014 surgery was was on February 20, 2014, and he did not receive his tobradex drops until March 6, 2014, which was 15 days after the surgery.  At his deposition, Dr. Komadina made clear that this was an unacceptable situation that increases the risk of recurrence:

Q:· Okay.· What length of delay would be acceptable to go without receiving the eye drops postoperative?

A:· You know, I think that that kind of a question assumes that there is any kind of safe delay and in my experience, there isn't such a thing.· You know, I think that a patient should always have their postoperative medications and use them particularly in the early stages after such surgery. I think that it increases the risk of infection and recurrence and other problems.· And so I don't know that there is such a thing as a safe period of time for patient not to do their medication.  I mean that's the whole point of, you know, my

discussion with the nursing staff there and it's just -- I don't know, you know, as we discussed earlier I don't know why the state would fund surgery for a patient and then not provide something in the scheme of things is relatively low cost.· So, I would say there is probably no safe period of time where the patient, you know, doesn't have to do the medication.· If you're asking, could they do it, get away with not doing it?· Well maybe, but I don't want the patient, particularly in a patient who's had a previous recurrence to have to try and figure that out.· I mean I'm not sure why we would ever want a patient to do that. (Exhibit 4 at page 37 line 14)

29.     According to the "Non-Formulary Drug Request" in Tingley Initial Discl. Bates No. 000398, the tobradex prescribed by Dr. Komadina was ordered on February 19, 2014, but is marked that it was emailed in February 26, 2014, which is consistent with the Plaintiff's account relayed to Dr. Komadina that he did not receive the appropriate postoperative medication from NDOC after the February 19, 2014 surgery.  *Id.*

30.     Subsequent to the February 19, 2014 surgery, the Plaintiff plead with Ms. McCullough several times requesting the required eye drops.  (See allegations of fact in Second Amended Complaint in Doc. #56, which were supported by the Declaration of Adam Tingley on page 8 and Exhibit 14).  At his Deposition,  Dr. Komadina also verified that his medical for the Plaintiff indicate that his assistant spoke with "Kaye" at Warm Springs about the Plaintiff's postoperative eye drops as follows:

Q:· Okay.· I would like to refer you next to what's been marked in Exhibit 1 as Bates Number 303.· And Dr. Komadina,  this document is your records from Mr. Tingley's medical file dated Tuesday, May 27th, 2014, is it not?
A:· That's correct.
Q:· Okay.· I'd like to direct you to the notes at the bottom left of the page.· I'd ask you to review that.· Just tell me what it says.
A:· Again, that's the -- from Julie Mendi, my ophthalmic technician that she spoke with Kaye at Warm Springs Correctional Center that we had, as I mentioned previously, that if we had samples, we try to get the patient samples.· He indicated that he haven't had any drops for three weeks.· And

we had a sample of Durezol, which is a type of steroidal medication and that I had given him samples of that medication to be used in his left eye. (Exhibit 4 page 25 line 10)

It is reasonable to conclude that the "Kaye" referred to above is Defendant Kary McCullah, as in Exhibit I to the Defendant's Motion, which is the Declaration of Ms. McCullah, she recalls the same conversation in May of 2014. Thus, in May of 2014, months after the Plaintiff had his February 19, 2014 surgery, the Plaintiff was still having difficulties getting eye drops in accordance with Dr. Komadina's orders.

31.     Subsequent to the second surgery, the Plaintiff plead with John B. Perry several times requesting the required eye drops.  Mr. Perry refused to provide the Plaintiff with the eye drops that Dr. Komadina prescribed in a timely manner, stating words equivalent to, "You are just an inmate, you will get your eye drops when you get them." (See allegations of fact in Second Amended Complaint in Doc. #56, which were supported by the Declaration of Adam Tingley on page 8 Exhibit 14).

32.     NDOC did not provide the Plaintiff with eye drops in a timely manner, and the Plaintiff has had another recurrence of pterygium.  Dr Komadina testified about the recurrence as follows:

Q:· And could you describe for me generally what this document shows?
A:· Well, this document is postoperative visit from his surgery on February 19th.· He is now almost two months after his surgery.· He had had -- he indicated to Julie, my ophthalmic technician, that he had not received neither of the two drops that I'd asked them to get for two weeks.· And I noted on his exam that he was starting to get a small recurrence of his pterygium on the nasal part of his cornea.· And, you know, I drew that little drawing there.· Overall, he was doing reasonably well considering that he was 2400 postoperatively, but his vision was 20/50 at that time.· And, you know, I had noted in the assessment part that, you know, I felt that he was starting to get

this recurrence because he was not using medications as prescribed. (Exhibit 4 at page 24 line 20)

33.     Plaintiff continues to suffer from the symptoms associated with pterygium as a result of the delay and/or denial of his second post-surgery treatment.   Plaintiff suffers from ongoing injury and severe emotional and physical pain caused by failure of this surgery, including but not limited to loss of vision, inflammation, tearing, dry and itchy eyes, headaches. (See allegations of fact in Second Amended Complaint in Doc. #56, which were supported by the Declaration of Adam Tingley on page 8 Exhibit 14).

## III.  ARGUMENTS IN MOTION

34.     The Defendant's Motion makes the following arguments: (1) that the applicable statute of limitations has run on the Plaintiffs claims (Motion at page 7 line 25); (2) that the Plaintiff failed to exhaust his administrative remedies under the requirements of the Prison Litigation Reform Act ("PLRA")(Motion at page 9 line 6); (3) that the Defendants were not deliberately indifferent to the Plaintiff's serious medical needs (Motion at page 11 line 9) and (4) that the Defendants are entitled to qualified immunity as the Defendants reasonably believed that their conduct was lawful.  (Motion at pages 15 line 18) The Plaintiff will respond to each of these arguments in turn below.

**The Statute of Limitations should be equitably tolled for the Plaintiff's pre-September 2012 claims**

35.     The Defendants argue that the Plaintiff is limited to those deliberate

indifference claims that occurred between September 18, 2012, and September 18, 2014 and that allegations relating to due process violations prior to September 30, 2011, fall outside the two year statute of limitations and must be dismissed. (Motion at page 9 line 1). Because all of the Plaintiff's claims related to Defendant's Hoffman, Perry, and McCullah fall within the period of limitation, the analysis below applies only to the Plaintiff's claims against Bannister.

36.     Under federal law, a claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action. *Tworivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999).  However, where the federal courts borrow the state statute of limitations, they also borrow the forum state's tolling rules. *Id.* at 992.  In Nevada, the two year tort claim limitation in NRS 11.190(4)(e) may be equitably tolled according to the following criteria: (1) the diligence of the claimant; (2) the claimant's knowledge of the relevant facts; (3) the claimant's reliance on authoritative statements that misled the claimant about the nature of the claimant's rights;  (4) any deception or false assurances on the part of party against whom the claim is made; (5) the prejudice to the defendant that would actually result from delay during the time the limitations period is tolled; and (6) any other equitable considerations appropriate in the particular case.  *Wisenbaker v. Farwell*, 341 F. Supp. 2d 1160 (D. Nev. 2004) citing *Copeland v. Desert Inn Hotel,*  99 Nev. 823 (Nev. 1983).

37.     The record above shows that the Plaintiff was continually and diligently requesting treatment for his condition from NDOC officials, including Dr. Bannister, by

filing kites and requesting care from NDOC medical providers.  The record also indicates that the Plaintiff's knowledge of what caused the failure of his first surgery in 2006 by Dr. Fischer was not clear until he consulted with Dr. Komadina about the critical importance of postoperative medication.  (See Exhibit 14)  The record indicates that Dr. Bannister delayed and/or denied the Plaintiff's pleas for help on a continuing and ongoing basis since 2004.

**The Plaintiff complied with the exhaustion requirements of the PLRA, under NDOC rules.  If the Plaintiff had filed multiple grievances for the same medical condition he could have been subject to discipline**

38.    The Defendants argue that because Plaintiff's second eye surgery was in February 2014, he was required to file a grievance related to the eye drop issue, and that he has not done so.   (Motion at page 10 line 12)  Attached to the Defendants Motion as Exhibit K are the grievance papers the Plaintiff filed with NDOC related to the issue in this case, i.e. that the Plaintiff was not receiving adequate medical care related to the pterygium in his left eye, which the Defendants impliedly concede, comply with the exhaustion requirements of the PLRA in the Defendant's Motion at page 10 line 8.

39.    Under the PLRA an action shall be brought with respect to prison conditions may not be brought until administrative remedies as are available are exhausted. *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992).   An inmate's compliance with the PLRA exhaustion requirement as to some, but not all claims does not warrant dismissal of the entire action. *Lira v. Herrera*, 427 F.3d 1164, 1175 (9th Cir. 2005).  However, the Plaintiff's filed grievance

in Exhibit K to the Defendants Motion is sufficient in scope to include the Plaintiff's claims related to the Defendant's failure to provide the plaintiff with postoperative eye drops as recommended by Dr. Komadina.  This is the case because the subject of the grievance, i.e. lack of adequate medical care for the Plaintiff's pterygium,  was ongoing at the time the grievance process was being conducted.   For example, the Plaintiff's Second Level Grievance at TINGLEY 358: DEF MSJ EXH K - 001,  was filed on February 27, 2014, and states: "Dr. Komadina did do surgery. This should have been done over 7 years ago! By neglecting to properly treat me, by not getting me to the the first surgery in a timely manner and doing nothing you've kept me in severe pain and suffering."  Defendant's Exhibit K shows that the Plaintiff received the response to the Second Level Grievance on April 22, 2014.  It is unreasonable to expect that the Plaintiff initiate a new grievance procedure on each individual instance of a violation of his constitutional rights as a whole.

40.    The Plaintiff's Second Amended Complaint alleged a single cause of action, i.e. violation of the Plaintiff's right to be free from cruel and unusual punishment. (Doc. #56 page 5 line 12).  There is a single medical issue in this case, i.e. neglect of proper treatment for the Plaintiff's pterygium, which the Defendants impliedly admit the Plaintiff complained about and grieved in accordance and compliance with the PLRA and Administrative Regulation 740, which is attached to the Defendant's Motion as Exhibit M.  Nothing in the PLRA imposes a name all defendants requirement for grievances *Jones v. Bock*, 549 U.S. 199 (U.S. 2007).  The level of detail necessary in a grievance to comply with the grievance

procedures will vary from system to system and claim to claim and it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion. *Id.* In fact, according to Administrative Regulation 740.09(2)(B), it is considered "abuse of the inmate grievance procedure" where an inmate files a grievance that contains "Specific claims or incidents previously filed by the same inmate." Further, according to Administrative Regulation 740.09(2)(F), it is considered "abuse of the inmate grievance procedure" where an inmate files a grievance that contains "two or more appropriate issues." Hence, if the Plaintiff had done what the Defendants now suggest in the Motion, i.e. file another grievance claim related to lack of treatment for his pterygium, he could have been subject to discipline under Administrative Regulation 740.09(2).

**The record is clear that the Defendants had knowledge of the Plaintiff's condition and unreasonably delayed or denied him adequate medical care**

41.     The Defendants argue that it cannot be said that Dr. Bannister was deliberately indifferent to Plaintiff's medical needs because there is no evidence that Dr. Bannister was aware of the issue. (Motion at page 13 line 23).   As stated in Dr. Bannister's Declaration, which is attached to the Defendant's Motion as Exhibit C, Dr. Bannister was the Medical Director for NDOC until his retirement in May 2013.  Exhibit 12, attached hereto, are the Dr. Bannister's responses to Interrogatories 10-13.  When asked in Interrogatory No. 10 what specific dates since 2004 did he served on the UR Panel, Bannister provided the following response:

INTERROGATORY NO .10:
Have you ever served on the Utilization Review ("UR") panel? If so, please detail the times you served on the UR panel since January 1, 2004.
RESPONSE TO INTERROGATORY NO. 10
Objection, overly broad as the request seeks information over an 11 year period. Notwithstanding this objection and without waiving it, Dr. Bannister states: Yes. I have served on the UR panel as the Medical Director. However, I do not recall the specific dates.

42.     Exhibit 13, attached hereto, are the Interrogatory Responses of Dr. Bannister to Interrogatories 2-9.   In response to Interrogatory No. 2, Bannister states that he was Medical Director of NDOC from 2006 to 2013.

43.     At the deposition of Dr. Gedney, she verified that Dr. Bannister , if he was in the UR Panel, would have seen the requests Dr. Gedney made on the Plaintiff's behalf:

Q:·  Okay.·  But if Dr. Bannister were on the UR panel at a time between 2004 and 2014, he would have seen your request to the UR panel on behalf of Mr. Tingley, would he not?
A:·  If he was on the panel at the time those requests went in, yes.  (Exhibit 7 page 18 line 21).

44.     At her deposition, Dr. Gedney also verified that Dr. Bannister was on the UR Panel (Exhibit 7 page 34 line 7).  Also, the affidavit of the Plaintiff in Exhibit 14 states that Dr. Gedney told the Plaintiff that it was Dr. Bannister that was denying his requests for surgery.

45.     At a minimum, a genuine issue of material fact exists as to whether Dr. Bannister was serving on the UR Panel at the time the UR Panel was evaluating the Plaintiff's multiple requests to have surgery in his eye as described above.   The record detailed above shows that while the UR panel continually failed to approve and/or deny the

Plaintiff treatment for his condition, the Plaintiff was forced to endure years or pain and

loss of vision in his eye.   Where a prisoner alleged that an almost two-month delay in

receiving any treatment for a fractured thumb, and a nineteen-month delay in being seen by

a hand specialist, had caused pain and the diminished use of his hand because the

fracture had healed improperly, this was sufficient to state a claim of deliberate

indifference to serious medical needs.  *Jett v. Penner*, 439 F.3d 1091, 1097 (9th Cir. Cal.

2006).

46.     In her Declaration, attached to the Motion as Exhibit E, Ms. Hoffman claims

that she obtained the generic "equivalent" to tobradex, "neomycin" shortly after the

surgery.  (Motion at page 14 line 16).  There is no evidence presented in the Motion on or

in the record that neomycin is equivalent to tobradex.  According to the testimony of Dr.

Komadina, tobradex was essential to the Plaintiff's chances of a successful surgery (Exhibit

4 page 15 line 18).  The Defendants have offered no expert opinion to contradict Dr.

Komadina's testimony that tobradex was essential to the Plaintiff's recovery from eye

surgery.  The Defendants have also offered no expert opinion that neomycin is actually

equivalent to tobradex.

47.     The Defendants also argue that there is no evidence to demonstrate

that Mr. Perry, Ms. Hoffman, or Ms. McCullah were deliberately indifferent to Plaintiff's

medical care. (Motion at page 14 line 9)   The evidence detailed above, including the

testimony of Dr. Komadina at his deposition, that  shows that the response of the Ms.

Hoffman to the requests of the Plaintiff and of Dr. Komadina showed that the Ms. Hoffman had knowledge that if the Plaintiff were denied tobradex, that it was likely that the surgery on his eye would fail as a result, that she did in fact deny the Plaintiff the tobradex that Dr. Komadina prescribed, and that the Plaintiff has had a recurrence as a result.  The Affidavit of the Plaintiff in Exhibit 14 also shows that he told Ms. Hoffman, Ms. McCullough, and Mr. Perry that he needed the eye drops and that each of these Defendants were indifferent to his requests.  In other words, a genuine issue of material fact exists as to whether the account of the Plaintiff and Dr. Komadina as to the deprivation of medical case is correct, or the Defendant's version of events is correct.

48.    For each named Defendant, the Plaintiff has shown that they had knowledge of the condition, that a serious medical need existed, and demonstrated that the Defendants failure to treat the Plaintiff's condition has resulted in further significant injury and the unnecessary and wanton infliction of pain, as the Plaintiff was forced to wait years for surgery and the Plaintiff's eye condition has returned as the result of the Defendant's failure to provide the Plaintiff with postoperative eye drops.  *Estelle v. Gamble,* 429 U.S. 97,  106 (1976).  The Plaintiff has also shown that the Defendant's response to the need was deliberately indifferent by showing that Bannister delayed and/or denied surgery for many years and that Hoffman, Perry, and McCullah failed to respond to the medical needs of the Plaintiff - and the Plaintiff suffered and continues to suffer harm as a result of the Defendant's failure to provide the Plaintiff with adequate medical care.  *Jett v. Penner*, 439

F.3d 1091, (9th Cir. Cal. 2006).

**The Defendants are not immune from acts that violate clearly established Constitutional rights**

49.     The Defendants argue in the Motion that qualified immunity shields the Defendants from liability because qualified immunity protects state officials sued in their individual capacity for damages unless the conduct complained of violates a clearly established constitutional or statutory right of which a reasonable person would know, citing *Jackson v. City of Bremerton*, 268 F.3d 647, 650 (9th Cir 1991).

50.     Government officials performing discretionary functions are entitled to a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (citations omitted).  A qualified immunity analysis on a motion for summary judgment starts with the threshold question of whether, based upon the facts taken in the light most favorable to the party asserting the injury, did the conduct violate a constitutional right. *Jackson v. City of Bremerton*, 268 F.3d 646 (9th Cir. Wash. 2001).  Whether the defendant violated a constitutional right and whether the right was clearly established at the time of the violation are pure legal questions for the court. *Serrano v. Francis*, 345 F.3d 1071, 1080 (9th Cir. 2003)

51.     It is well established that deliberate indifference to a prisoner's serious illness or injury states a cause of action under 42 U.S.C. Section 1983. *Estelle v. Gamble*, 429 U.S. 97,

105 (1976).   It is also well established that denial of medical attention to prisoners constitutes a violation if the denial amounts to deliberate indifference to serious medical needs of the prisoners." *Toussaint v. McCarthy*, 801 F.2d 1080, 1111 (9th Cir. 1986).   It is clear from the facts presented above that denial of medical of care for an extended period of time was serious enough to the Plaintiff's clearly established 8th Amendment constitutional right to be free from cruel and unusual punishment was violated by the failure of the Defendants to provide care to the Plaintiff and the Defendant's deliberate indifference to the Plaintiff's serious medical needs.   In *Hunt v. Dental Dep't*, 865 F.2d 198, 200-01 (9th Cir. 1989), the Ninth Circuit has held that a mere three-month delay in replacing dentures was causing pain this was sufficient to state a claim of deliberate indifference to serious medical needs.   The record in this matter shows that the Plaintiff was forced to wait years to receive surgery for his condition, and that during this time period the Plaintiff was experiencing tremendous suffering.   The right to reasonable access to treatment for a condition that was rendering the Plaintiff blind and in varying states of agony for years was clearly established at the time of the violation(s) by the Defendants.

52.     There is no reasonable argument at hand that the Defendants did not know that such an occurrence was unlawful and that the Plaintiff's Constitutional rights were not violated based on the facts and evidence presented above.

///

///

///

RESPECTFULLY submitted this February 20, 2016.

By: _____

Luke Andrew Busby, Ltd.
Nevada State Bar No. 10319
216 East Liberty St.
Reno, NV 89501
775-453-0112
luke@lukeandrewbusbyltd.com
Attorney for the Plaintiff


**CERTIFICATE OF SERVICE**

I hereby certify that on this Thursday, February 20, 2016, I electronically transmitted

the foregoing pleading to the Clerk's Office using the CM/ECF System for filing and

transmittal of a Notice of Electronic Filing to all counsel registered to receive Electronic

Filings and/or mailed the foregoing pleading via US Mail postage prepaid to the following

persons:


Benjamin R. Johnson
Deputy Attorney General
State of Nevada - Office of the Attorney General
Public Safety Division - Bureau of Litigation
100 N. Carson Street - Carson City, NV 89701-4717
E: bjohnson@ag.nv.gov


By: _____
Luke Busby

27

Exhibit List

1.   Answer to Second Amended Complaint
2.   Description and Picture of Ptygerium
3.   Komadina Expert Disclosure
4.   November 4, 2015 Deposition of Dr. Komadina
5.   Physician's Orders (Confidential)
6.   UR Panel Docs (Confidential)
7.   November 19, 2015 Deposition of Dr. Gedney
8.   Dr. Fischer Medical Records (Confidential)
9.   Kites (Confidential)
10.  Prescription Information (Confidential)
11.  November 19, 2014 Halling Deposition
12.  Bannister Response to Plaintiff's Interrogatories 10-13
13.   Bannister Response to Plaintiff's Interrogatories 1-9
14.  Affidavit of Adam Tingley