1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

ADAM WYNN TINGLEY,                                    3:14-cv-00358-MMD-VPC

                              Plaintiff,

                                                     **REPORT AND RECOMMENDATION**

   v.                                                **OF U.S. MAGISTRATE JUDGE**

NEVADA DEPARTMENT OF
CORRECTIONS, *et al.*,

                              Defendants.

        This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge.  The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.  Before the court is defendants' motion for summary judgment (ECF No. 66, 67).  Plaintiff opposed (ECF Nos. 73, 75), and defendants replied (ECF No. 79).  The court has reviewed the motion and papers, and hereby recommends that summary judgment be entered in favor of defendants.

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

        Adam Wynn Tingley ("plaintiff"), formerly an inmate in the custody of the Nevada Department of Corrections ("NDOC"), brings this civil rights action pursuant to 42 U.S.C. § 1983.  Proceeding *pro se*, plaintiff filed a complaint and an application to proceed *in forma pauperis* on July 10, 2014, alleging that NDOC and Warm Springs Correctional Center ("WSCC") officials violated his Eighth Amendment right against cruel and unusual punishment by denying him timely medical treatment from 2004 through 2014.  (ECF No. 1.)  The District Court screened the complaint pursuant to 28 U.S.C. 1915A and permitted plaintiff to proceed on a claim of Eighth Amendment deliberate indifference to a serious medical need against former NDOC Medical Director Dr. Bruce Bannister ("Bannister").  (ECF No. 4.)

Plaintiff filed a First Amended Complaint ("FAC") on May 15, 2015 (ECF No. 43). Shortly thereafter, plaintiff was released from NDOC custody and secured counsel (ECF Nos. 46, 52). The parties stipulated to a Second Amendment Complaint ("SAC"), which was filed on July 31, 2015 (ECF No. 56). The SAC asserts a claim of Eighth Amendment deliberate indifference to a serious medical need against Bannister, WSCC Nurse Susan Hoffman ("Hoffman"), WSCC Nurse Kerry McCullah ("McCullah"), and WSCC Director of Nursing Jonathan Perry ("Perry") (collectively, "defendants").

As related in the SAC, plaintiff was held at various NDOC facilities or on parole from the spring of 2004 until his release in June 2015. (#56 at 3.) In 2004, he was told by an NDOC doctor that he had a pterygium in his left eye and required surgery.[1] (*Id.*) Between 2004 and 2006 plaintiff repeatedly kited to request surgery, eye drops, or other pain treatment; meanwhile, his pain increased and he lost sight in his left eye. (*Id.*) Despite knowing of plaintiff's eye problems, Bannister, as part of the Utilization Review ("UR") Panel, denied plaintiff's requests for surgery. (*Id.*; #73 at 6) Surgery was eventually performed on July 12, 2006 by Dr. Fischer, an outside surgeon, and plaintiff was prescribed eye drops necessary for postoperative recovery. (#56 at 3.) After NDOC officials interfered with plaintiff's access to eye drops, plaintiff's symptoms recurred. (*Id.*) Plaintiff's requests for a second surgery were denied. (*Id.*) Due to the inadequate treatment he was provided, plaintiff suffered from headaches, obscured vision, and pain from 2006 to 2014. (*Id.*)

A second eye surgery was performed on February 19, 2014 by Dr. Komadina. (*Id.* at 4; #73 at 10.) Once again, postoperative eye drops were prescribed to plaintiff but withheld by NDOC officials. (#56 at 4.) Although plaintiff's doctor notified defendants that the drops were essential to plaintiff's successful recovery, Hoffman told plaintiff it was not her job to provide the

---

[1] A pterygium is a "fleshy growth that originates on the conjunctiva and that can spread to the corneal limbus and beyond. Pterygia are relatively common in the general population and typically follow an indolent course, with changes in appearance but little effect on vision and the eye itself. . . . [M]ost ophthalmologists commonly consider them an insignificant problem until the lesions encroach on the visual axis." (#73-2 at 2.) If a lesion grows in size, "it may become cosmetically unpleasant for the patient . . . [and] may cause visual symptoms due to induced astigmatism or direct encroachment onto the visual axis." (*Id.*)

2

1  eye drops, and insisted the doctor do so instead; McCullah refused to provide the drops in a

2  timely manner; and Perry told plaintiff, "You are just an inmate, you will get your eye drops

3  when you get them."  (*Id.*)  As a result, the second surgery also failed, and plaintiff continues to

4  suffer from loss of vision, inflammation, tearing, dry and itchy eyes, and headaches.  (*Id.* at 5.)

5                              **II.    LEGAL STANDARD**

6          Summary judgment allows the court to avoid unnecessary trials.  *Nw. Motorcycle Ass'n v.*

7  *U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  The court properly grants summary

8  judgment when the record demonstrates that "there is no genuine issue as to any material fact and

9  the movant is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317,

10  330 (1986).  "[T]he substantive law will identify which facts are material.  Only disputes over

11  facts that might affect the outcome of the suit under the governing law will properly preclude the

12  entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be

13  counted."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" only

14  where a reasonable jury could find for the nonmoving party.  *Id.*  Conclusory statements,

15  speculative opinions, pleading allegations, or other assertions uncorroborated by facts are

16  insufficient to establish a genuine dispute.  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984

17  (9th Cir. 2007); *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996).  At this

18  stage, the court's role is to verify whether reasonable minds could differ when interpreting the

19  record; the court does not weigh the evidence or determine its truth.  *Schmidt v. Contra Costa*

20  *Cnty.*, 693 F.3d 1122, 1132 (9th Cir. 2012); *Nw. Motorcycle Ass'n*, 18 F.3d at 1472.

21          Summary judgment proceeds in burden-shifting steps.  A moving party who does not bear

22  the burden of proof at trial "must either produce evidence negating an essential element of the

23  nonmoving party's claim or defense or show that the nonmoving party does not have enough

24  evidence of an essential element" to support its case.  *Nissan Fire & Marine Ins. Co. v. Fritz*

25  *Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  Ultimately, the moving party must demonstrate, on

26  the basis of authenticated evidence, that the record forecloses the possibility of a reasonable jury

27  finding in favor of the nonmoving party as to disputed material facts.  *Celotex*, 477 U.S. at 323;

28

3

1    *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).  The court views all evidence

2    and any inferences arising therefrom in the light most favorable to the nonmoving party.  *Colwell*

3    *v. Bannister*, 763 F.3d 1060, 1065 (9th Cir. 2014).

4            Where the moving party meets its burden, the burden shifts to the nonmoving party to

5    "designate specific facts demonstrating the existence of genuine issues for trial."  *In re Oracle*

6    *Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  "This burden is not a light one," and

7    requires the nonmoving party to "show more than the mere existence of a scintilla of evidence. . .

8    .  In fact, the non-moving party must come forth with evidence from which a jury could

9    reasonably render a verdict in the non-moving party's favor."  *Id.* (internal citations omitted).

10   The nonmoving party may defeat the summary judgment motion only by setting forth specific

11   facts that illustrate a genuine dispute requiring a factfinder's resolution.  *Liberty Lobby*, 477 U.S.

12   at 248; *Celotex*, 477 U.S. at 324.  Although the nonmoving party need not produce authenticated

13   evidence, Fed. R. Civ. P. 56(c), mere assertions, pleading allegations, and "metaphysical doubt as

14   to the material facts" will not defeat a properly-supported and meritorious summary judgment

15   motion, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

16                                   **III.    DISCUSSION**

17           Defendants move for summary judgment on several grounds.  First, they argue that any

18   Eighth Amendment violations alleged to have occurred prior to September 18, 2012 are barred by

19   the statute of limitations.  Second, plaintiff's claim is in part barred by a failure to exhaust his

20   administrative remedies.  Third, defendants were responsive to plaintiff's medical needs, and thus

21   plaintiff's claim must fail on the merits.  The court more fully considers these arguments below.[2]

22   **A.     Civil Rights Claims Pursuant to 42 U.S.C. § 1983**

23           42 U.S.C. § 1983 aims "to deter state actors from using the badge of their authority to

24   deprive individuals of their federally guaranteed rights."  *Anderson v. Warner*, 451 F.3d 1063,

25   1067 (9th Cir. 2006) (quoting *McDade v. West*, 223 F.3d 1135, 1139 (9th Cir. 2000)).  The statute

26

27   _____

28   [2] Because the court concludes on these grounds that summary judgment is appropriate, it does not
     reach defendants' fourth argument that they are shielded from liability by qualified immunity.

"provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights[,]" *Conn v. Gabbert*, 526 U.S. 286, 290 (1999), and is "merely . . . the procedural device for enforcing substantive provisions of the Constitution and federal statutes," *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Claims under § 1983 require the plaintiff to allege (1) the violation of a federally-protected right by (2) a person or official who acts under the color of state law. *Warner*, 451 F.3d at 1067. To prevail, the plaintiff must allege and prove sufficient facts under each element of the underlying constitutional or statutory right.

At the time of the events alleged, defendants were each state prison officials acting within their respective capacities under state law. Plaintiff alleges violations of his Fourteenth Amendment right to due process. Therefore, he has satisfied § 1983's threshold requirements.

**B.      Portions of plaintiff's claim are barred by the statute of limitations.**

**1.      Statute of Limitations under 42 U.S.C. § 1983**

42 U.S.C. § 1983 does not contain a statute of limitations. Instead, federal courts apply the forum state's statute of limitations for personal injury claims. *Comm. Concerning Cmty. Improvement v. City of Modesto*, 853 F.3d 690, 701 n.3 (9th Cir. 2009). Thus, in Nevada, the statute of limitations for a § 1983 claim is two years. *Reed v. Nev. Dep't of Corr.*, No. 3:14-cv-00313-MMD-VPC, 2015 WL 5092692, at *5 (Aug. 27, 2015); Nev. Rev. Stat. § 11.190(4)(e).

A claim based on deliberate indifference to a serious medical need accrues when the plaintiff knows or has reason to know of the defendants' deliberate indifference. *TwoRivers v. Lewis*, 174 F.3d 987, 991–92 (9th Cir. 1999). However, because the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires inmates in Nevada to exhaust their claims through the NDOC's grievance process prior to filing suit in federal court, the statute of limitations is tolled for the pendency of the grievance process. *See Brown v. Valoff*, 422 F.3d 926, 942–43 (9th Cir. 2005); *Wisenbaker v. Farwell,* 341 F. Supp. 2d 1160, 1165 (D. Nev. 2004). As such, events underlying a § 1983 action must fall within two years of the filing date, plus the number of days between the filing of a grievance and prison officials' final response.

1

### 2.     Application

2      Plaintiff's original complaint was screened and filed by the court on September 18, 2014.

3   (*See* #4.)   Applying Nevada's two-year statute of limitations, defendants argue that summary

4   judgment must be granted with regard to any violations plaintiff alleges to have occurred prior to

5   September 18, 2012.[3]   (#66 at 7–9.)   In opposition, plaintiff maintains that he is entitled to

6   equitable tolling based on his diligence in requesting treatment from NDOC officials by filing

7   kites, and because he did not learn why his first surgery failed until after the second surgery in

8   2014. (#73 at 19.)

9      Plaintiff quotes *Wisenbaker* to support his argument.   Therein, the court observed that the

10  Nevada Supreme Court applied six criteria to determine whether equitable tolling was

11  appropriate:

12      (1) "the diligence of the claimant"; (2) "the claimant's knowledge of the relevant
       facts"; (3) "the claimant's reliance on authoritative statements . . . that misled the
13      claimant about the nature of the claimant's rights"; (4) any deception or false
       assurances on the part of [the] party against whom the claim is made; (5) the
14      prejudice to the defendant that would actually result from delay during the time the
       limitations period is tolled; and (6) "any other equitable considerations appropriate
15      in the particular case."

16

17  *Id.* at 1166 (quoting *Copeland v. Desert Inn Hotel*, 673 P.2d 490, 492 (Nev. 1983)).   Defendants

18  respond that the six factors set forth in *Wisenbaker* weigh against tolling in this instance.   (#79 at

19  3–4.)

20      The court agrees that *Wiskenbaker*, while a correct statement of the law, is unhelpful to

21  plaintiff's case.   There, the court concluded that the statute of limitations was tolled while the

22  plaintiff diligently exhausted administrative remedies and pursued a prior action in federal court.

23  *Id.* at 1165–68.   In this case, plaintiff cites a multitude of medical kites dating from August 2004

24

25  ───────────────

26  [3] Defendants identify September 18, 2012, as the relevant date for statute of limitations purposes
    in their reply (#79 at 4), but also cite September 30, 2011 in their motion for summary judgment
27  (#66 at 9).   Because no explanation was given for the discrepancy, and because defendants
    connected the September 30, 2011 date to "allegations relating to due process violations," the
28  court assumes the earlier date is a typographical error.

6

to October 2006, and from July 2008 to December 2014, in which he requested treatment or medication.  (*See* #73 at 5 n.1, 8 n.2 (citing #75-4).)  But no matter how fervently or frequently plaintiff sought treatment, he has not provided the court with evidence, in the form of grievances or prior court fillings, that he exercised the type of diligence required: diligence in pursuing his claim.  *See Wisenbaker*, 341 F. Supp. 2d at 1166 ("The Court finds that Plaintiff was diligent in filing the actions leading to, and including, the present case."); *Pruett v. Hooligan*, 2008 WL 2954750, at \*7 (D. Nev. July 29, 2008) (plaintiff not entitled to tolling where there was no evidence he diligently pursued his claims); *Townsend v. Brooks*, , 2008 WL 611802, at \*4 (D. Nev. March 5, 2008) (finding no evidence of diligence where the plaintiff filed just one grievance on the issue, and it was not completed to the second level of review).  Accordingly, plaintiff's diligence is not grounds for tolling the statute of limitations.

Plaintiff further claims that he only became aware of the facts relevant to his claim when he spoke with Dr. Komadina soon after his surgery in February 2014: it was then that he learned his first surgery may have failed due to his difficulties in obtaining eye drops, and not because Dr. Fischer performed the surgery incorrectly.  (#73-14 at 2.)  The argument misses the point. "Under Nevada law, 'dismissal on statute of limitations grounds is . . . appropriate when uncontroverted evidence irrefutably demonstrates plaintiff discovered or should have discovered *the facts giving rise to the cause of action*,' not proof of the cause of action."  *Pruett*, at \*7 (emphasis in original) (quoting *Bemis v. Estate of Bemis*, 967 P.2d 437, 440 (1998)).  The facts giving rise to plaintiff's deliberate indifference claim, as relating to defendants' pre-2012 actions, concern Bannister's denial and delay of plaintiff's access to eye surgery; he does not contend that Bannister denied plaintiff eye drops or otherwise thwarted the success of the first surgery.  (*See* #56 at 2–5.)  Critically, by his own admission, plaintiff knew or believed long before 2014 that Bannister was responsible for delaying his surgeries.  Plaintiff attests that Dr. Karen Gedney told him between 2004 and 2006 that Bannister would decide whether the proposed surgery would move forward, and in 2008 that "it was Dr. Bannister on the UR Panel [who] kept denying [plaintiff's] requests for surgery."  (#73-14 at 2.)  As a consequence, plaintiff's ignorance to the

1  importance of the postoperative eye drops is irrelevant, and does not warrant a tolling of the
2  statute of limitations.

3          Finally, the statute of limitations is not tolled by plaintiff's assertion that Bannister was
4  deliberately indifferent "on a continuing and ongoing basis since 2004." (#73 at 19.)  The
5  continuing violation doctrine permits a plaintiff to seek relief for events that occurred outside the
6  limitations period.  *Knox v. Davis*, 260 F.3d 1009, 1013 (9th Cir. 2001).  Where a violation is
7  ongoing in nature, the statute of limitations does not begin to run until the wrongful conduct
8  comes to an end.  *Flowers v. Carville*, 310 F.3d 1118, 1126 (9th Cir. 2002).  However, "[t]he
9  doctrine applies only where there is 'no single incident' that can 'fairly or realistically be
10  identified as the cause of significant harm.'"  *Id.* (quoting *Page v. United States*, 729 F.2d 818,
11  821–22 (D.C. Cir. 1984)).  It may not be used to challenge discrete acts of deliberate indifference
12  falling outside the limitations period, even "when they are related to acts alleged in timely filed
13  charges."  *MacGregor v. Dial*, No. 2:13–cv–1883 JAM AC P, 2015 WL 1405492, at *8 (E.D.
14  Cal. Mar. 26, 2015) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002)).
15  "Each discrete . . . act starts a new clock for filing charges alleging that act."  *Morgan*, 536 U.S. at
16  122.[4]  Further, the Ninth Circuit "has repeatedly held that a 'mere continuing *impact* from past
17  violations is not actionable.'"  *Knox*, 260 F.3d at 1013 (emphasis in original) (quoting *Grimes v.*
18  *City & Cnty. of San Francisco*, 951 F.2d 236, 238–39 (9th Cir. 1991)).

19          Based on a close reading of the SAC and opposition, it is clear that plaintiff's challenge
20  stems from discrete acts.  Plaintiff identifies three points in 2004 and 2006 at which Bannister,
21  acting as a member of the UR Panel, allegedly denied or delayed plaintiff's access to surgery:

22          a.  On September 10, 2004[,] Dr. Scott referred the Plaintiff for surgery . . . .
23              This request was disapproved by the UR Panel on September 14, 2004.

24          b.  On December 21, 2004, Dr. Gedney referred the Plaintiff for eye surgery . . .
25              . The UR Panel did not respond to this request in the document in Plaintiff's
                possession[.]

26  _____
27  [4] Although *Morgan* was a Title VII case, the Ninth Circuit has "applied *Morgan* to bar § 1983
    claims predicated on discrete time-barred acts, notwithstanding that those acts are related to
28  timely-filed claims."  *Carpinteria Valley Farms, Ltd. v. Cnty. of Santa Barbara*, 344 F.3d 822,
    829 (9th Cir. 2003).

c.  On April 5, 2006, Dr. Gedney again referred the plaintiff for surgery . . . .
The UR panel approved the request, but directed the surgery to occur after
July 1, 2006.  On the same document, the Plaintiff's discharge date is noted
as June 3, 2006, before his surgery was to be scheduled.

(#73 at 6 (internal citations omitted).)  The UR Panel made four additional decisions relevant to

plaintiff's treatment between 2008 and 2013:

a.  On June 26, 2008, Dr. Gedney requested UR Panel approval for the Plaintiff
to see Dr. Komadina . . . . The UR Panel disapproved this request on July
15, 2008 without explanation.

b.  On January 29, 2010, Dr. Aranas requested UR Panel approval for the
Plaintiff to see an ophthalmologist.  The UR Panel responded on March 2,
2010 by directing that the Plaintiff be transferred to NNCC to be seen by Dr.
Fischer.

c.  On March 4, 2014, "V. VanHornal" requested that the Plaintiff be referred
to Dr. Fischer due to his pterygium.  The UR Panel responded on March 12,
2013 by approving the request.

d.  On June 19, 2013, Dr. Gedney then requested that the Plaintiff be referred to
Dr. Komadina for his failed pterygium surgery.  The UR Panel responded on
June 25, 2013 by deferring the request back to Dr. Gedney.  On September
23, 2013, Dr. Gedney responded by stating, "I am not an eye specialist UR
needs to send [patient] to Dr. Komadina or deny it."

(*Id.* at 9 (internal citations omitted).)  Accordingly, this is not a case where "no single incident"

may be identified as the cause of harm.  *See Flowers*, 310 F.3d at 1126.  Plaintiff's deliberate

indifference claim accrued after each decision by the UR Panel, triggering the running of the

statute of limitations.  To the extent that plaintiff suffered ongoing harm thereafter, that harm was

the continuing impact of the violation and insufficient to toll the statute.

In sum, none of the reasons or explanations offered by plaintiff demonstrates that he

entitled to equitable tolling.  However, the court does not agree that September 18, 2014 is the

appropriate date for assessing the timeliness of plaintiff's claim.  Plaintiff's initial complaint and

application for leave to proceed *in forma pauperis* were filed with the court on July 10, 2014.

(*See* #1.)  The date of screening is irrelevant.  In addition, as defendants acknowledge, plaintiff

exhausted available administrative remedies on the issue of delayed surgeries.  (*See* #66 at 10.)

Plaintiff initiated grievance log number 2006-296-9990 ("the '990 grievance") at the informal

level on October 26, 2013, and received a denial at the second level on April 22, 2014.  (*See* #66-

1   12.)  Accordingly, applying Nevada's two-year statute of limitations plus the 178 days plaintiff

2   spent exhausting administrative remedies, the court concludes that summary adjudication is

3   appropriate for those portions of the deliberate indifference claim that are based on events

4   occurring prior to January 10, 2012.

5   **C.    Bannister was not deliberately indifferent to plaintiff's serious medical needs during**
6          **the relevant time period.**

7          **1.    Deliberate Indifference Standard**

8          Deliberate indifference to an inmate's medical needs is proscribed by the Eighth

9   Amendment's protection against cruel and unusual punishment, and states a cause of action under

10  § 1983.  *Estelle v. Gamble*, 429 U.S. 97, 102, 104–05 (1976).  However, "[d]eliberate

11  indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).  It

12  is not enough that an inmate demonstrate medical malpractice or negligence.  *Id.*  To succeed on

13  an Eighth Amendment claim, an inmate must satisfy "both an objective standard—that the

14  deprivation was serious enough to constitute cruel and unusual punishment—and a subjective

15  standard—deliberate indifference." *Colwell*, 763 F.3d at 1066 (internal quotation omitted).

16         A deprivation is considered sufficiently serious if the state's failure to provide treatment

17  could result in further injury or cause unnecessary and wanton infliction of pain.  *Jett v. Penner*,

18  439 F.3d 1091, 1096 (9th Cir. 2006).  Serious medical needs include those "that a reasonable

19  doctor or patient would find important and worthy of comment or treatment; the presence of a

20  medical condition that significantly affects an individual's daily activities; or the existence of

21  chronic and substantial pain." *Colwell*, 763 F.3d at 1066 (internal quotation omitted).

22         If a plaintiff makes the requisite objective showing, he must show that the prison official

23  responded to that need with deliberate indifference.  This requires the plaintiff to demonstrate the

24  defendant knew of and disregarded "an excessive risk to inmate health and safety," *Toguchi*, 391

25  F.3d at 1057, meaning that he or she must have had actual knowledge from which to infer a

26  substantial risk of harm existed and must also have made that inference, *Colwell*, 763 F.3d at

27  1066.  An accidental or inadvertent failure to provide adequate care is not enough to impose

28

1    liability.  *Estelle*, 429 U.S. at 105–06.  Rather, the standard lies "somewhere between the poles of

2    negligence at one end and purpose or knowledge at the other . . . ."  *Farmer*, 511 U.S. at 836.

3            Prison officials are deliberately indifferent "when they deny, delay, or intentionally

4    interfere" with a prisoner's medical treatment, *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir.

5    2002) (internal quotation omitted), such as by ignoring the instructions of the treating physician

6    or surgeon, *Wakefield v. Thompson*, 177 F.3d 1160, 1165 (9th Cir. 1999).  Still, the medical care

7    due is not limitless.  "[S]ociety does not expect that prisoners will have unqualified access to

8    health care . . . ."  *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).  As such, a difference of opinion

9    between a physician and a prisoner as to the appropriate course of treatment is not actionable

10   under the Eighth Amendment, *Toguchi*, 391 F.3d at 1058, nor is "the routine discomfort inherent

11   in the prison setting," *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000).

12           **2.    Application**

13           Defendants do not dispute that plaintiff had a serious medical need.[5]  Thus, the court's

14   analysis focuses on the second prong of the inquiry, whether Bannister acted with deliberate

15   indifference.  As explained above, due to the statute of limitations the court considers only those

16   incidents that occurred between January 10, 2012 and July 10, 2014.

17           Bannister served as the NDOC Medical Director from 2006 until his retirement on June

18   10, 2013.  (#66-4 at 2; #73 at 22.)  Defendants argue that there is no evidence that Bannister was

19   aware of plaintiff's medical need.  (#66 at 13.)  Citing Bannister's sworn declaration, they

20   maintain that he never met with plaintiff or provided him medical care.  (*Id.*; #66-4 at 2.)  The

21   '990 grievance could not have put Bannister on notice, as it was not filed until October 2013,

22   months after Bannister retired.  (#66 at 13.)  Finally, defendants point to a series of medical kites

23   sent in April 2013.  On April 16, plaintiff kited Dr. Gedney to ask if the UR Panel would consider

24   a corneal transplant.  (*Id.*)  Dr. Gedney told plaintiff that he would have to go through Bannister.

25   (*Id.*)  Plaintiff then kited Bannister, but used the wrong form; L. Grochowski was the responding

26

27   _____

28   [5] Courts have generally concluded that blindness "and even less severe losses of vision are serious
     medical needs."  *Colwell*, 763 F.3d at 1066–68.

                                                    11

official.  (*Id.*)  Plaintiff resubmitted the kite on the appropriate form on April 25.  (*Id.*)  However, the copy provided by defendants to the court suggests that no response was made, and Bannister may not have received the kite.  (*Id.*; #67-1 at 5.)

Defendants' evidence does not foreclose a reasonable jury from finding that Bannister knew of a substantial risk to plaintiff's health.  Supported by Dr. Gedney's deposition testimony, plaintiff argues that Bannister would have seen any requests lodged with the UR Panel on his behalf if Bannister was serving on the Panel at the time the request was made.  (#73 at 22.)  Bannister admits to serving on the UR Panel during his tenure as Medical Director, and although dates for that service are missing from his interrogatory response, there is no question that multiple requests for surgery or consultations were made between 2006 and 2014.  (*See* #75-2; #73-12 at 3.)  While Bannister may not be found liable for those incidents that occurred prior to prior to January 10, 2012, they may properly be considered as evidence of knowledge.

Nevertheless, plaintiff cannot succeed on his deliberate indifference claim.  Were a jury to find that Bannister knew of a substantial risk of harm existed, it must also be persuaded that Bannister deliberately disregarded that risk, and did so within the limitations period.  *See Toguchi*, 391 F.3d at 1057.  Just two requests were sent to the UR Panel on plaintiff's behalf between January 10, 2012 and July 10, 2014.  The first was submitted on March 4, 2013 by V. VanHornal, and requested that plaintiff be referred to Dr. Fischer for his pterygium.  (#73 at 9.)  The UR Panel approved the request eight days later.  (*Id.*)  Accordingly, the undisputed evidence does not support plaintiff's assertion that Bannister acted to delay, deny, or otherwise interfere in plaintiff's treatment.

The second was made on June 19, 2013 by Dr. Gedney, who requested that plaintiff be referred to Dr. Komadina.  (*Id.* at 9.)  The UR Panel responded on June 25 by deferring the request back to Dr. Gedney.  (*Id.*)  On September 23, Dr. Gedney advised the panel that she was not an eye specialist, and, therefore, that plaintiff be sent to Dr. Komadina or the request be denied altogether.  (*Id.*)  In light of plaintiff's deteriorating eyesight and alleged pain the exchange arguably demonstrates an impermissible delay in treatment.  Still, it is not an act of

1    deliberate indifference in which Bannister could have partaken—he retired from NDOC nine days

2    before Dr. Gedney made the initial request, and two weeks before the UR Panel sent the matter

3    back to Dr. Gedney.  Accordingly, because a reasonable jury could not find that Bannister denied

4    or delayed plaintiff's treatment, summary judgment should be entered in his favor.

5    **D.    Plaintiff failed to exhaust his claim as it relates to his postoperative care.**

6    **1.    Exhaustion under the PLRA**

7         The PLRA provides that "[n]o action shall be brought with respect to prison conditions

8    under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or

9    other correctional facility until such administrative remedies as are available are exhausted."  42

10   U.S.C. § 1997e(a).  Exhaustion is mandatory.  *Porter v. Nussle*, 534 U.S. 516, 524 (2002).  The

11   requirement's underlying premise is to "reduce the quantity and improve the quality of prisoner

12   suits" by affording prison officials the "time and opportunity to address complaints internally

13   before allowing the initiation of a federal case.  In some instances, corrective action taken in

14   response to an inmate's grievance might improve prison administration and satisfy the inmate,

15   thereby obviating the need for litigation."  *Id.* at 524–25.

16        The PLRA requires "proper exhaustion" of an inmate's claims.  *Woodford v. Ngo*, 548

17   U.S. 81, 90 (2006).  Proper exhaustion means an inmate must "use all steps the prison holds out,

18   enabling the prison to reach the merits of the issue."  *Griffin v. Arpaio*, 557 F.3d 1117, 1119 (9th

19   Cir. 2009) (citing *Woodford*, 548 U.S. at 90).  Thus, exhaustion "demands compliance with an

20   agency's deadlines and other critical procedural rules because no adjudication system can

21   function effectively without imposing some orderly structure on the course of its proceedings."

22   *Woodford*, 548 U.S. at 90–91.

23        "The level of [factual] detail in an administrative grievance necessary to properly exhaust

24   a claim is determined by the prison's applicable grievance procedures."  *Morton v. Hall*, 599 F.3d

25   942, 946 (9th Cir. 2010) (citing *Jones v. Bock*, 549 U.S. 199, 218 (2007)).  "[W]hen a prison's

26   grievance procedures are silent or incomplete as to factual specificity, 'a grievance suffices if it

27   alerts the prison to the nature of the wrong for which redress is sought.'"  *Griffin*, 557 F.3d at

28

1120 (quoting *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002)); *see also Sapp v. Kimbrell*, 623 F.3d 813, 824 (9th Cir. 2010).   Because the purpose of the grievance "is not to lay the groundwork for litigation[,]" but "to alert the prison to a problem and facilitate its resolution," the grievance "need not include legal terminology or legal theories unless they are in some way needed to provide notice of the harm being grieved." *Griffin*, 557 F.3d at 1120.   In other words, the grievance suffices as long as it sufficiently places prison officials on notice of facts by which they can determine the "root cause" of the issue, regardless of the inmate's legal theories or claims should litigation ensue.   *See McCollum v. Cal. Dep't of Corrs. & Rehab.*, 647 F.3d 870, 876–77 (9th Cir. 2011); *Akhtar v. Mesa*, 698 F.3d 1202, 1211 (9th Cir. 2012).

The issue of exhaustion "should be decided, if feasible, before reaching the merits of a prisoner's claim." *Albino v. Baca*, 747 F.3d 1162, 1170 (9th Cir. 2014).   "If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56.   If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts."   *Id.* at 1166.

Failure to exhaust is an affirmative defense.   *Bock*, 549 U.S. at 216.   The defendant bears the burden of proving that an available administrative remedy was unexhausted by the inmate. *Albino*, 747 F.3d at 1172.   A remedy is "available" when it is capable of use.   *Brown*, 422 F.3d at 937.   If the defendant makes such a showing, the burden shifts to the inmate to "show there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him by 'showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile.'"   *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) (quoting *Albino*, 747 F.3d at 1172).   Still, the ultimate burden of proof remains with the defendant.   *Id.*   Where circumstances render administrative remedies "effectively unavailable," an inmate's failure to exhaust is excused.   *Sapp*, 623 F.3d at 822.

1

2.    **NDOC's Inmate Grievance System**

2

The procedural rules relevant to exhaustion "are defined not by the PLRA, but by the

3

prison grievance process itself." *Bock*, 549 U.S. at 218.   The grievance process at NDOC

4

institutions is governed by Administrative Regulation ("AR") 740.[6]

5

NDOC's grievance process features three levels, beginning with the informal grievance.

6

If an inmate cannot the issue through discussion with an institutional caseworker, the inmate may

7

file an informal grievance within six months "if the issue involves personal property damages or

8

loss, personal injury, medical claims or any other tort claims, including civil rights claims," or

9

within ten days for any other issues, including classification and disciplinary.   AR 740.04,

10

740.05(4).   The inmate's failure to submit the informal grievance within this time frame "shall

11

constitute abandonment of the inmate's claim at this, and all subsequent levels." *Id.* at 740.05(8).

12

NDOC staff is required to respond within forty-five days. *Id.* at 740.05(12).   An inmate who is

13

dissatisfied with the informal response may appeal to the formal level within five days. *Id.*

14

At the first formal level, the inmate must "provide a signed, sworn declaration of facts that

15

form the basis for a claim that the informal response is incorrect," and attach "[a]ny additional

16

relevant documentation." *Id.* at 740.06(2).   The grievance is reviewed by an official of a higher

17

level, who has forty-five days to respond. *Id.* at 740.06(1), (4).   Within five days of receiving a

18

dissatisfactory first-level response, the inmate may appeal to the second level, which is subject to

19

still-higher review. *Id.* at 740.07(1).   Officials are to respond to a second-level grievance within

20

sixty days, specifying the decision and the reasons the decision was reached. *Id.* at 740.07(3), (4).

21

Once an inmate receives a response to the second-level grievance, he or she is considered to have

22

exhausted available administrative remedies and may pursue civil rights litigation in federal court.

23

24

25

26

[6] Defendants attach an unauthenticated copy of AR 740 to their motion.  (*See* #66-14.)  However, AR 740 is a readily available public document, and the court will cite to the online version. *See*

27

NDOC, *Administrative Regulation 740: Inmate Grievance Procedure* (2014), http://doc.nv.gov/ uploadedFiles/docnvgov/content/About/Administrative_Regulations/AR%20740%20-

28

%20091614.pdf.

3.     **Application**

Plaintiff's claim against Hoffman, McCullah, and Perry pertains not to the delay in approving eye surgery, but to their alleged failure to provide plaintiff with prescribed postoperative eye drops following surgery in February 2014.  (*See* #56 at 4–5.)  Defendants argue that plaintiff did not exhaust administrative remedies with respect to that portion of his claim, as the '990 grievance failed to mention eye drops, or plaintiff's postoperative care more generally. (#66 at 10–11.)  Plaintiff counters that his allegations of inadequate treatment were sufficiently broad to encompass the inadequate care he received following the 2014 operation, and that "[i]t is unreasonable to expect that [he] initiate a new grievance procedure on each individual instance of a violation of his constitutional rights as a whole."  (#73 at 20.)

The parties do not dispute that the '990 grievance is the sole applicable grievance. Plaintiff initiated the grievance at the informal level on October 26, 2013.  Therein, plaintiff stated:

> My one grievance issue is I've been waiting since 2006 to have a second eye surgery. I've felt like having glass in my left eye, headaches, complete loss of vision in [my] left eye[,] and severe pain.  Recently I was sent to Reno to see Dr. Komadina again.  Again he recommended surgery.
>
> Remedy sought: (1) to be sent to Dr. Komadina for the surgery; (2) I stay close to Dr. Komadina, WSCC or NNCC, until surgery complete.  Furthermore, as has happened in the past, I do not want to be retaliated against by moving me south to keep me from having surgery or punish me for this grievance.

(#66-12 at 22.)    In response, the Director of Nursing at NNCC advised plaintiff that a recommendation that he see a corneal specialist had been made to the UR Panel.  (*Id.* at 19.) Plaintiff filed his first level grievance on December 13, 2013:

> On 7-12-06 I underwent a pterygium excision with a graft.  Due to the extensive pterygiam (the worst Dr. Fischer MD. had ever seen) and the length of time it took NDOC/NNCC medical and administrative staff to get me surgery, the surgery was not successful.  I continued to show scar tissue in the visual axis and severe pain.  I was sent to Dr. Komadina as recommended by Dr. Fischer. . . . Surgery was suggested by Dr. Komadina . . . . This was requested to [the] UR Panel and denied. I have had to deal with loss of vision and severe pain and major disruption in any quality of life due to NDOC/NNCC medical and administrative staff denying over and over to repair this.  This last summer I was finally sent back to see Dr.

16

1

2      Komadina after (7) seven years!  He, Dr. Komadina, once again has recommended
       surgery.

3
       Remedy sought: (1) To have whatever surgery recommended by Dr. Komadina, and
4      have it done by Dr. Komadina. Including any after care. (2) If UV protective glasses
       are suggested by Dr. Komadina, I want to be able to have approve[d] one[s]
5      purchased from outside by NDOC at no cost to me. (3) Ensure I will not be
       retaliated against for this grievance or necessary medical treatment in any way . . . .
       (4) I also want $500.00 per day going back to 7-12-2006.

6    (*Id.* at 8–11.)  The grievance was denied on January 1, 2014 on the grounds that plaintiff had seen

7    a specialist and a plan was in place for his care.  (*Id.* at 6.)  Plaintiff filed a final, second-level

8    grievance on February 27, 2014, after surgery had been performed by Dr. Komadina:

9
       2/19/14 Dr. Komadina did do surgery.  This should have been done over 7 years
10     ago! By neglecting to properly treat me, by not getting me to the first surgery in [a]
       timely manner and doing nothing, you've kept me in severe pain and suffering
11     under *Estelle v. Gamble*.

12   (*Id.* at 2.)  As with at previous levels, the responding NDOC official denied the grievance on the

13   merits, and advised plaintiff that his surgery and scheduled follow-up appointments resolved the

14   complaint.  (*Id.*at 3.)

15        Because AR 740 provides little guidance as to the factual specificity required in a

16   grievance, plaintiff's grievance was sufficiently specific if it alerted prison officials to the nature

17   of plaintiff's problem—namely, that he was unable to secure the prescribed postoperative eye

18   drops.  *See Griffin*, 557 F.3d at 1120.  Reviewing the '990 grievance, it clearly did not.  In

19   plaintiff's words, his "one grievance issue [wa]s that [he'd] been waiting since 2006 to have a

20   second eye surgery."  (#66-12 at 5.)  Plaintiff raised the issue of delayed surgery at every level of

21   the '990 grievance, and the responding officials reasonably concluded that performance of the

22   surgery constituted a resolution.  Even the second-level grievance, filed after the eye drop issue

23   allegedly began, makes no mention of inadequate postoperative treatment.  (*See id.* at 2.)  Thus,

24   while plaintiff is correct that he need not have named specific defendants or a precise legal

25   theory, his rejoinder fails in that he "did not 'provide enough information . . . to allow prison

26   officials to take appropriate responsive measures.'"  *Griffin*, 557 F.3d at 1121 (quoting *Johnson v.*

27   *Testman*, 380 F.3d 691, 697 (2nd Cir. 2004)).

28

Plaintiff also argues that the court should deem administrative remedies exhausted, or the exhaustion requirement excused, because AR 740.09(2)(B) renders it an "abuse of the inmate grievance procedure" to file a grievance containing the same "[s]pecific claims or incidents previously filed by the same inmate." (#73 at 21.)  To file a second grievance related to the lack of treatment for his pterygium, plaintiff maintains, would be to subject himself to discipline.  (*Id.*)  Had the '990 grievance discussed plaintiff's postoperative care, even in general terms, plaintiff's argument would perhaps hold water.  On the present facts, however, it is untenable.  Plaintiff's interpretation of the AR wholly ignores the word "specific," and severely limits an inmate's ability to alert prison officials of new concerns.  Any complaint related to or stemming from a prior issue is rendered off limits.  Therefore, his reading undermines the very purposes of the exhaustion requirement: to provide prison officials the opportunity to correct mistakes before they are haled into federal court and to create a useful administrative record for those grievances that do become the subject of litigation.  *See Sapp*, 623 F.3d at 823; *Reyes v. Smith*, 810 F.3d 654, 657 (9th Cir. 2016).  Further, the specter of discipline is without merit.  In the event that an inmate commits an "abuse of the inmate grievance procedure," AR 740.09(3) and (4) instruct the caseworker to return the improper grievance to the inmate, along with a memorandum describing the violation.  Provided that the time frame for filing has not elapsed, the inmate is afforded the opportunity to resubmit the grievance in the proper form.  Accordingly, the AR fails to support plaintiff's assertion that he was discouraged or precluded from filing a second grievance, and is no reason for the court to excuse plaintiff's failure to exhaust administrative remedies.

Defendants carried their burden of demonstrating that plaintiff left available administrative remedies unexhausted with respect to the issue of his postoperative treatment.  Therefore, the court concludes that Hoffman, McCullah, and Perry are entitled to summary judgment.

## IV.   CONCLUSION

Based on the foregoing, the court finds that plaintiff's deliberate indifference claim is barred in part by the statute of limitations, and in part by plaintiff's failure to exhaust available

administrative remedies.  Further, the remaining portion of plaintiff's claim fails on the merits, as plaintiff did not raise a material issue of fact as to whether Bannister was deliberately indifferent to his serious medical need.  Therefore, the court recommends that defendants' motion for summary judgment be granted in its entirety.

The parties are advised:

1.      Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this Report and Recommendation within fourteen days of receipt.  These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.      This Report and Recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

## V.      RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that defendants' motion for summary judgment (#66) be **GRANTED**;

**IT IS FURTHER RECOMMENDED** that the Clerk **ENTER JUDGMENT** and close this case.

**DATED**: June 8, 2016.

**UNITED STATES MAGISTRATE JUDGE**